# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                            CASE NO: 2:16-cr-110-FtM-29CM

ELIJAH HART

_____

## AMENDED[1]  REPORT AND RECOMMENDATION[2]

Before the Court is Defendant's Motion to Suppress Evidence (Doc. 24), filed

on December 30, 2015, which the Honorable John E. Steele referred to the

undersigned for a Report and Recommendation.   The United States filed its response

in opposition (Doc. 38) on February 13, 2017.   The undersigned held an evidentiary

hearing on March 9, 2017.   Doc. 44.   A transcript of the hearing was filed on March

29, 2017.   Doc. 48.

Defendant Elijah Hart is charged with knowingly accessing with intent to view

any visual depiction involving the use of a minor engaging in sexually explicit

conduct, in violation of 18 U.S.C. §§ 2252(a)(4)(B), (b)(1).   Doc. 3.   Defendant's

prosecution stems from an investigation by the Federal Bureau of Investigation

("FBI") of Playpen, a website dedicated to child pornography and operated as a

"hidden service" on an anonymous network.

Defendant seeks to suppress all evidence obtained as the result of a search

---

[1] *See infra* at 7 n.11.

[2] A party has fourteen days from this date to file written objections to the Report and
Recommendation's factual findings and legal conclusions. A party's failure to file written
objections waives that party's right to challenge on appeal any unobjected-to factual finding
or legal conclusion the district judge adopts from the Report and Recommendation. See 11th
Cir. R. 3-1.

warrant that allowed the FBI to employ a network investigative technique ("NIT") to remotely search for certain identifying information from "activating computers" – those computers of individuals who logged into the Playpen website and downloaded or attempted to download child pornography. Defendant also seeks to suppress evidence and statements obtained from a second court-authorized search warrant for Defendant's residence issued by United States Magistrate Judge Mac R. McCoy in the Middle District of Florida, and Defendant's interview during the execution of this warrant. Defendant argues that United States Magistrate Judge Theresa Carroll Buchanan in the Eastern District of Virginia issued the search warrant authorizing the deployment of the NIT (hereafter the "NIT Warrant") in violation of Title 28 of the United States Code, Section 636(a), and Rule 41 of the Federal Rules of Criminal Procedure. Defendant further argues that Judge McCoy issued the subsequent warrant authorizing the search of Defendant's home (hereinafter the "Residential Warrant") without probable cause. Moreover, Defendant argues the task force agents who searched Defendant's residence violated his rights pursuant to *Miranda*[3] and the Fifth Amendment to the United States Constitution by engaging in a custodial interrogation without first advising Defendant of his *Miranda* rights. For the reasons discussed below, the undersigned respectfully recommends that the motion be denied.

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

# I.    Summary of the Evidence

The Government called two witnesses:   FBI Special Agent Daniel Alfin[4] and Collier County Detective and FBI Child Exploitation Task Force Officer Zachary Ewert.[5]   Doc. 48 at 3.   The Government introduced four exhibits, all of which the Court admitted into evidence: (1) search warrant application and affidavit from the Eastern District of Virginia[6] ("Gov't Ex. 1"); (2) search warrant application and affidavit from the Middle District of Florida ("Gov't Ex. 2"); (3) CD containing the audio recording of Defendant's interview ("Gov't Ex. 3"); and a transcript of the audio recording of Defendant's interview ("Gov't Ex. 3t").   *See* Doc. 43.   Defendant did not call any witnesses or introduce any exhibits.

## a.  The Tor Network

The Onion Router or "Tor network" is an anonymous online network that resulted from a research project of the United States Navy Research Laboratory for

---

[4] Agent Alfin has been employed with the FBI since 2009.   Doc. 48 at 6.   He is assigned to the criminal investigative division, violent crimes against children section, major case coordination unit.   *Id.*   He is trained in computer forensics and online investigative techniques, and his duties involve the investigation of individuals who utilize various types of technology to facilitate the production, advertisement, and distribution of child pornography.   *Id.* at 7.   Agent Alfin was one of the lead investigators in the Playpen website investigation.   *Id.* at 8.

[5] Officer Ewert has eighteen years of law enforcement experience.   Doc. 48 at 91.   He currently is a detective for the Collier County Sheriff's Office and is assigned to the FBI's child exploitation task force.   *Id.* at 90.

[6] The Government's Exhibit List (Doc. 43) lists the Search Warrant Application and Affidavit from the Eastern District of Virginia ("VA") as its Exhibit 1; however, the complete exhibit marked for identification and admitted into evidence also includes the Search and Seizure Warrant from the Middle District of Florida.   *See* Gov't Ex. 1.   The Court will cite the VA Affidavit as "Gov't Ex. 1, Aff.," the VA Search Warrant as "Gov't Ex. 1, NIT Warrant," and the Search and Seizure Warrant from the Middle District of Florida as "Gov't Ex. 1, Residential Warrant."

the primary purpose of protecting government communications.[7]   Doc. 48 at 10-13, 45;   Gov't Ex. 1, Aff. ¶ 7.   It is now available to the public at large, and its anonymity benefits have resulted in its use for both lawful and unlawful purposes.   Doc. 48 at 11-12, 46-47.   Agent Alfin testified that the primary and lawful purpose of the Tor network is to access the traditional or "open" Internet while concealing one's real location.   Doc. 48 at 10-13; Gov't Ex. 1, Aff. ¶ 9.   Generally, when one accesses the traditional Internet to visit a website, the website's Internet Protocol ("IP") address is viewable to the user, and the user's IP address is viewable to the website.   *Id*. Armed with this information, both the website and the user can determine each other's location.   *Id*.   A user wishing to conceal his location while browsing the open Internet can do so by obscuring his IP address, which may be accomplished through the Tor network.

The Tor network conceals a user's location by bouncing user communications around a distributed network of relay computers, called "nodes," that are run by volunteers around the world.   Doc. 48 at 15-16; Gov't Ex. 1, Aff. ¶ 8.   In order to access the Tor network, the user must install in his or her computer the Tor software, which is available online at no cost.   Doc. 48 at 16; Gov't Ex. 1, Aff. ¶ 7.   Once installed, a user accessing a website through the Tor network would not directly connect to the website but would first bounce through different nodes located anywhere in the world.   Doc. 48 at 12; Gov't Ex. 1, Aff. ¶ 8.   The last computer that

---

[7] As one court explained, "[t]he Onion Router is so named because of its onion-like layers of encryption that operate to obscure users' identities."   *United States v. Jean*, 207 F. Supp. 3d 920, 924 (W.D. Ark. 2016).

routes the user's communications is called the "exit node." Gov't Ex. 1, Aff. ¶ 8. IP logs of websites operating in the Tor network contain the IP addresses of the exit nodes, rather than the users' actual IP addresses, thereby obscuring the users' true location.[8] Doc. 48 at 36; Gov't Ex. 1, Aff. ¶ 29. Accordingly, the traditional IP identification techniques used by law enforcement on the open Internet are not viable with the Tor network.[9] Doc. 48 at 12-13; Gov't Ex. 1, Aff. ¶ 8.

Despite its legal uses, the Tor network has another function, referred to as "hidden services," which has provided a forum for illicit activities. Doc. 48 at 13-14; Gov't Ex. 1 Aff. ¶ 9. Agent Alfin explained that hidden services provide the same anonymity for a website as they do for its users by concealing the website host's actual IP address. Doc. 48 at 13-14. Thus, Agent Alfin testified, an individual can host an illegal website, such as a child pornography website, configure it as a Tor hidden service, and operate it without detection by law enforcement. *Id.* at 14. To locate a hidden service, users must take certain affirmative steps because, unlike the traditional Internet, a user may not simply, for example, conduct a search on a search engine such as google.com and retrieve a link to a Tor hidden service. *Id.* at 18-19. Instead, a user would locate a directory of Tor hidden services related to the content

---

[8] Technically, however, even though the destination website cannot see a user's IP address, the user's IP address is disclosed to the Tor entry node, that is, the first computer to receive the search query from the user. Doc. 48 at 17.

[9] Generally, once law enforcement officers seize a website whose users are suspected of engaging in unlawful activity, they can view the IP address logs of the seized website and, through a number of freely available public websites, determine what Internet Service Provider ("ISP") owns a particular IP address. Doc. 48 at 36-37; Gov't Ex. 3 at 28. The officers then subpoena the ISP to determine the user to whom the IP address was assigned at a given date and time. Doc. 48 at 36-37.

of interest to the user, in this case, child pornography, and retrieve a link to the hidden service website. *Id.* at 18. Alternatively, a user might discover the link to a hidden service by directly communicating with other Tor users who are aware of the hidden service. *Id.* at 19. Agent Alfin testified that for these and other reasons, it would be "incredibly unlikely" for a user inadvertently or unintentionally to stumble upon a Tor hidden service such as Playpen. *Id.* at 19.

### b. Playpen[10]

The Playpen website operated in the Tor network and was configured as a Tor hidden service. Doc. 48 at 8, 14; Gov't Ex. 1, Aff. ¶ 10. Agent Alfin became aware of Playpen when it was created in August 2014 because he saw a link to Playpen listed on two different websites whose purposes were to advertise current and updated links to child pornography websites. Doc. 48 at 9, 18-19. Agent Alfin observed the Playpen website for its content and activities and discovered that everything on the website was dedicated either to child pornography, child abuse, or distribution of child pornography. *Id.* at 9-10, 83. Because the website operated as a hidden service, however, the FBI was unable to determine the location where Playpen was being hosted, the identity of its operator, or the identity of its users. *Id.* at 9, 14.

Between August 2014 and December 2014, the FBI's abilities were confined to

---

[10] The NIT warrant application refers to the Playpen website as "Target Website" and the Residential Warrant application refers to the Playpen website as "Website A." Gov't Ex. 1, Aff. ¶ 2 n.1; Gov't Ex. 2 ¶ 6 n.1; Doc. 48 at 98-99. Both warrant applications explain that because the website remained active at the time the applications were submitted, disclosure of the name of the website in the applications would alert potential users of the site to the government's investigation and thus undermine it. *Id.*

accessing the website and monitoring its activity. Doc. 48 at 14. In December 2014,[11] the FBI received a favorable break in their investigation when a foreign law enforcement agency alerted it that the Playpen website was misconfigured, and, because of this misconfiguration, briefly appeared on the open Internet. *Id.* at 14-15, 60. For this brief period, the FBI was able to see Playpen's actual IP address, which allowed investigators to locate a computer server that hosted the website in North Carolina. *Id.* at 15, 20. From then forward, using various forms of legal process (i.e., subpoenas, search warrants, pen registers), the FBI was able to identify the creator/administrator of Playpen, who resided in Naples, Florida. *Id.* at 15, 20-21. On or about February 20, 2015, FBI agents arrested the administrator of Playpen in Naples, gained access to the owner's administrative account, and seized control of the Playpen website from its web-hosting facility in North Carolina. *Id.* at 20-22.

The FBI then transferred a copy of the Playpen website from North Carolina to a government-controlled server in the Eastern District of Virginia. *Id.* at 22. Instead of immediately shutting down the website, the FBI operated the Playpen

---

[11] There is either an inconsistency in Agent Alfin's testimony or a typographical error in the transcript as to the date that the FBI became aware of the Playpen website's misconfiguration. In Agent Alfin's direct examination, he testified that the FBI was monitoring the website between August 2014 and December 2014. Doc. 48 at 14. Later on direct he testified the FBI became aware that the Playpen website was misconfigured in December *2015*. *Id.* During his cross examination, however, he testified that the date FBI became aware of the misconfiguration was in December *2014*. *Id.* at 60. Based on the remaining timeline of events, e.g., that Playpen's creator was arrested in February 2015 after which the FBI seized control of the server from February to March 2015 (*Id.* at 20-22), the Court believes the correct date is December 2014, and has amended its Report and Recommendation accordingly.

website from the Eastern District of Virginia for a brief period from February 20, 2015 through March 4, 2015 in an effort to identify its users/members. *Id.* at 21-22. As of February 2015, the Playpen website contained a total of 158,094 members, 9,333 topics and 95,148 posts. Gov't Ex. 1, Aff. ¶ 11. Agent Alfin testified that it was the largest child pornography website the FBI had ever known to exist at that time. Doc. 48 at 9.

### c.  The NIT Warrant

On February 20, 2015, the FBI submitted an application for a search warrant to Judge Buchanan in the Eastern District of Virginia. Gov't Ex. 1. Special Agent Douglas Macfarlane signed a thirty-one-page affidavit in support of the application. Gov't Ex. 1, Aff. Agent Macfarlane listed the relevant statutes implicated in the investigation, defined the technical terms used in the affidavit, and explained why there was probable cause to believe that administrators and users of the Playpen website were committing crimes relating to the exploitation of children. *See id.* Agent Macfarlane explained the nature of the Tor network, the operation of the hidden services, and, in vivid detail, the Playpen website. *See id.* Agent Macfarlane explained that "the entirety of the [Playpen website] is dedicated to child pornography" and listed some of the sub-forums that contained some of the "most egregious examples of child pornography and retellings of real world hands on sexual abuse of children." Gov't Ex. 1, Aff. ¶ 27.

The affidavit explained that a copy of the Playpen server containing the contents of the Playpen website was located on a computer facility in the Eastern

District of Virginia, and Playpen would continue to operate from that server in Virginia. *Id.* ¶ 30. Agent Macfarlane requested Judge Buchanan to authorize the FBI to deploy a NIT from its server in Virginia for a period not to exceed thirty days.[12] *Id.* ¶¶ 30-34. Agent Macfarlane reasoned that the NIT was necessary to locate and apprehend the users of Playpen "who are engaging in the continuing sexual abuse and exploitation of children, and to locate and rescue children from the imminent harm of ongoing abuse and exploitation." *Id.* ¶ 30.

The NIT consisted of computer instructions attached to the content appearing on the Playpen website so that when a user downloaded any of the content from Playpen, which was located in the Eastern District of Virginia, into the user's computer — wherever it might be located — the instructions caused the user's computer, referred to as the "activating computer," to transmit certain identifying information back to the government's computer. *Id.* ¶ 33; Doc. 48 at 23-24. The information sought to be seized was:

1. the activating computer's actual IP address, and the date and time that the NIT determines what that IP address is;

2. a unique identifier generated by the NIT (e.g., a series of numbers, letters, and/or special characters) to distinguish data from that of other activating computers, that would be sent with and collected by the NIT;

3. the type of operating system running on the computer, including type (e.g., Windows), version (e.g., Windows 7), and architecture (e.g., x 86);

---

[12] The Affidavit specified: "I request authority to use the NIT, which will be deployed on [Playpen] while [Playpen] operates in the Eastern District of Virginia, to investigate any user or administrator who logs into [Playpen] by entering a username and password." Gov't Ex. 1, Aff. ¶ 32.

4. information about whether the NIT has already been delivered to the activating computer;

5. the activating computer's Host Name;

6. the activating computer's active operating system username; and

7. the activating computer's media access control ("MAC") address;

Gov't Ex. 1, Aff., Attachment B (certain quotation marks omitted); Doc. 48 at 29-35. Agent Alfin characterized this information as "the digital information where the NIT ended up." Doc. 48 at 29-30.

Agent Macfarlane requested authority for the NIT to "cause an activating computer – *wherever located* – to send to a computer controlled by or known to the government . . . messages containing information that may assist in identifying the computer, its location, other information about the computer and the user of the computer." Gov't Ex. 1, Aff. ¶ 46(a) (emphasis added). Judge Buchanan issued the warrant authorizing the use of the NIT to be deployed on the computer server located at the government facility in the Eastern District of Virginia, and to obtain the identifying information from any activating computer user who logs into the Playpen website by entering a username and password. Gov't Ex. 1, NIT Warrant. Judge Buchanan limited the government's use of the NIT to thirty days. *Id.*

### d. The FBI's use of the NIT

Agent Alfin explained that the NIT was installed on the government-controlled server in the Eastern District of Virginia with the ultimate purpose of identifying members of the Playpen website by, most importantly, revealing their IP addresses. Doc. 48 at 22-23. As he explained, an individual's IP address does not reside on a

user's computer.  *Id.* at 34-35.  Rather, the ISP assigns a unique IP address to each of its subscribers for the purpose of directing the routing of information between the user's computer and the destination website.  *Id.*  The NIT, therefore, did not collect the IP address from the user's computer but rather caused the user's computer to communicate with the government's computer over the open Internet, thus bypassing the Tor anonymous features and revealing the user's real IP address.  *Id.*  The remaining information sought primarily was to distinguish the user's computer from other computers located at the user's premises.  *Id.* at 29-35.

Although the warrant authorized the NIT to be deployed when a user logged into the Playpen website by entering a username and password, Agent Alfin testified that in the majority of cases, the FBI waited to deploy the NIT until someone (1) entered the Playpen website by entering a username and password, and (2) accessed a forum to begin downloading child pornography.  *Id.* at 26-28.  As the user was downloading the requested content from the Playpen website, such as text, graphics, or video, the user also downloaded the NIT, which was attached to that content.  *Id.*

Agent Alfin testified that within "less than a second" the NIT transmitted the identifying information to the FBI, generally "before the images that [the user] requested even load[ed] on [his] screen."  *Id.* at 83.  After the NIT completed its function, it disappeared from the activating computer without a trace.  *Id.* at 37, 76-77.  Agent Alfin testified that if no one accessed the Playpen website and at least attempted to download content from the Playpen website, the NIT would remain dormant in the government-controlled server in Virginia.  *Id.* at 26.  Thus, the

user's actions of downloading information from the Playpen website to his computer — wherever located — caused the NIT to travel from the server in Virginia to the user's computer. *Id.* Agent Alfin specifically rejected the contention that the NIT was installed in the Defendant's computer in the Middle District of Florida. *Id.* at 42, 75, 79.

### e. The investigation of Defendant and the Residential Warrant

After the FBI concluded its investigation of the Playpen website, it sent the users' identifying information to the appropriate field offices. *Id.* at 37. In June 2015, Officer Ewert received information on the FBI's investigation of the Playpen website, along with a "target DVD" that contained an IP address that was connected to a username "thegabetrain." *Id.* at 93; Gov't Ex. 2 ¶ 33. Through independent investigation, the agents learned that the IP address was assigned to Jose Cruz[13] at Defendant's address located in the Middle District of Florida. Gov't Ex. 2 ¶ 39. The target DVD also contained statistics of the number of hours "thegabetrain" had logged into the Playpen website and the images and posts[14] that the user accessed. *Id.* On July 27, 2015, Officer Ewert applied for a search warrant of Defendant's home and submitted a thirty-four-page affidavit in support of the warrant application. Gov't Ex. 2. On the same day, Judge McCoy issued the Residential Warrant authorizing the search of Defendant's residence for evidence of child pornography. Gov't Ex. 1,

---

[13] During his interview, Defendant stated that Jose Cruz is his mother's boyfriend and lived with Defendant. Gov't Ex. 3t at 9.

[14] "Postings can contain text messages, still images, video images, or web addresses that direct other members to specific content the poster wishes. . . . A 'post' or 'posting' is a single message posted by a user." Gov't Ex. 2 ¶ 5(a).

Residential Warrant.

Officer Ewert's affidavit described the nature of the Tor network and described Playpen as a child pornography website "dedicated to the advertisement and distribution of child pornography and the discussion of matters pertinent to the sexual abuse of children, including the safety and security of individuals who seek to sexually exploit children online." Gov't Ex. 2 ¶¶ 7-11. The affidavit explained how accessing the Playpen website required numerous affirmative steps by the user, making it "extremely unlikely" to stumble upon it without understanding its content and primary purpose. *Id.* ¶ 8. Registration warnings included recommendations to hide the users' identity and automatic bans against anyone discussing law enforcement related activity. *Id.* ¶¶ 14, 17. The affidavit further stated that "[o]n the main page of [the Playpen website], located to either side of the site name were two images depicting partially clothed prepubescent girls with their legs spread apart, with a focus on the females' genitalia." *Id.* ¶ 14.

The affidavit further explained that between February 20, 2015 and March 4, 2015, law enforcement agents monitored the Playpen website and documented its contents and user activity. *Id.* ¶ 11. A user with the username "thegabetrain" originally registered an account on the Playpen website on January 9, 2015. *Id.* ¶ 31. This same user had been actively logged into the Playpen website for a total of sixteen hours between January 9, 2015 to March 4, 2015. *Id.* ¶ 32. The affidavit explained the FBI's deployment of the NIT to retrieve the identifying information from the activating computers. *Id.* ¶ 30. It further explained that on February 22,

2015, the user "thegabetrain," with IP address 73.54.81.121 and after logging into the website with a username and password, accessed a post on the Playpen website; however, the post was deleted before law enforcement could capture the data. *Id.* ¶ 34. On two subsequent sessions on February 24, 2015, the user "thegabetrain" accessed a post that contained a link to an image that depicted child pornography and another post that contained a link to an image that depicted child pornography.[15] *Id.* ¶¶ 36, 37. On those occasions, although the FBI determined that the "thegabetrain" signed in with a user name and password, it did not collect the IP address. *Id.* ¶ 35.

From the IP address initially associated with "thegabetrain," and using publicly available websites, FBI agents were able to determine that the ISP Comcast operated the IP address connected with the username "thegabetrain." *Id.* ¶ 38. The FBI served an administrative subpoena to Comcast, and Comcast provided the FBI with the name and residential address affiliated with the IP address of "thegabetrain." *Id.* ¶ 39. Officer Ewert relied on this information in seeking the Residential Warrant.

### f. Execution of the Residential Warrant and Defendant's Interview

Law enforcement officers executed the search warrant at Defendant's residence on July 30, 2015 at approximately 6:45 a.m. Doc. 48 at 105, 137. Officer Ewert testified that the officers knocked on the door of Defendant's residence for

---

[15] The posts are described in explicit detail in the affidavit and need not be repeated here. Gov't Ex. 1, Residential Warrant ¶¶ 36, 37.

approximately forty-five seconds and announced that they were law enforcement. *Id.* at 107, 138. One of the home's occupants looked outside the window, stared at the officers, but declined to open the door. *Id.* at 107. After approximately twenty more seconds, out of concern for officer safety, the officers pried open the door with a halligan tool and entered the house with their guns drawn. *Id.* at 107-08, 138. At that time, Defendant was in his bedroom sleeping with his door closed. *Id.* at 116; Gov't Ex. 3t at 91. Officer Ewert testified that Defendant did not immediately open his door when the officers attempted to enter, and, due to safety concerns, the officers kicked Defendant's door open. *Id.*

Officer Ewert further testified that once inside the house, the officers escorted its five occupants outside and conducted a sweep of the house, after which the officers holstered their weapons and permitted the occupants to return back inside. Doc. 48 at 108, 140. Officer Ewert and his partner, task force officer Kevin Bunch, requested to speak with Defendant. Doc. 48 at 109. With Defendant's consent, Officers Ewert and Bunch interviewed Defendant on the back lanai of his home. *Id.* at 116. Officer Ewert testified that he told Defendant that he was not required to speak with the officers and that he was free to leave at any point. *Id.* at 117-18.

The officers' weapons were concealed during the interview, and Officer Ewert described the tone of the interview as "very laid back, lighthearted" with laughing and discussions about video games. Doc. 48 at 110. During the interview, Defendant admitted to using the username "thegabetrain," viewing child pornography, and accessing the Playpen website. *Id.* at 115. Defendant explained

that he found the Playpen website by accessing Hidden Wiki, a directory listing links to child pornography. *Id.* At no point during the interview did the officers read Defendant his *Miranda* rights. *Id.* at 142. Defendant was not arrested that day. *Id.* at 118. The interview was recorded and transcribed, and the transcript and recording were admitted into evidence at the suppression hearing as Government's Exhibits 3 and 3t, respectively. *See* Doc. 43.

## II. Analysis

### a. Whether Judge Buchanan lawfully issued the NIT Warrant

Defendant argues that the NIT Warrant issued by Judge Buchanan in the Eastern District of Virginia clearly violated the established jurisdictional limits of Rule 41 of the Federal Rules of Criminal Procedure and Title 28, Section 636(a), of the United States Code. Doc. 24 at 6-15. The Government responds that Rule 41(b)(4) [16] properly authorized the issuance of the NIT Warrant as a "tracking device," and the warrant complied with the Federal Magistrates Act, 28 U.S.C. § 636(a). Doc. 38 at 15-21. The undersigned recommends a finding that Rule 41(b)(4) authorized Judge Buchanan to issue the NIT Warrant as a "tracking device." Alternatively, even if there was a violation of Rule 41(b), the undersigned recommends that suppression is unwarranted and the motion should be denied. [17]

---

[16] Defendant discusses each of the subsections of Rule 41(b); however, because the Government only argues that the warrant was authorized under 41(b)(4), the Court will focus its analysis only on this subsection.

[17] In fact, the Court may choose to immediately consider whether the exclusionary rule applies. *United States v. Leon*, 468 U.S. 897, 925 (1984) ("[C]ourts could reject suppression motions posing no important Fourth Amendment questions by turning immediately to a consideration of the officers' good faith. We have no reason to believe that our Fourth Amendment jurisprudence would suffer by allowing reviewing courts to exercise

Because the Playpen website investigation has led to the arrest of numerous defendants nationwide, the NIT Warrant issued by Judge Buchanan has been the subject of numerous motions to suppress on the same bases Defendant asserts here in federal district courts across the United States. Courts to have considered the same issue have reached varying conclusions: either (1) the NIT Warrant properly was issued under 41(b) as a tracking device;[18] (2) the NIT Warrant violated Rule 41(b), or the court assumed without deciding that it violated Rule 41(b), but nonetheless concluded that suppression was unwarranted;[19] or, what appears to be

---

an informed discretion in making this choice."). This approach has been used by courts considering the same NIT warrant. *See, e.g., United States v. Schuster*, No. 1:16-CR-51, 2017 WL 1154088, at *5 (S.D. Ohio Mar. 28, 2017) (employing this approach because "while [the d]efendant's motion to suppress poses a complex and multi-faceted series of technical questions, the resolution of which has perplexed district courts across the country, the underlying issue has since been entirely resolved by amendment of the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 41(b) (2016), *amended by* Fed. R. Crim. P. 41(b)(6) (Dec. 1, 2016). Therefore, the Court finds that resolution of the Fourth Amendment issues serves no value to Fourth Amendment jurisprudence, as the potential risk of harm is no longer capable of repetition.") (emphasis in original).

[18] *See e.g., United States v. Austin,* No. 3:16-cr-00068, — F. Sup. 3d — 2017 WL 496374 (M.D. Tenn. Feb. 2, 2017); *United States v. Sullivan*, No. 1:16-cr-270, 2017 WL 201332 (N.D. Ohio Jan. 18, 2017); *United States v. Bee*, No. 16-002, 2017 WL 424905 (W.D. Mo. Jan. 13, 2017), *report and recommendation adopted*, No. 16-00002-01-CR-W-GAF, 2017 WL 424889 (W.D. Mo. Jan. 31, 2017); *United States v. McLamb*, No. 16-cr-092, 2016 WL 6963046 (E.D. Va. Nov. 28, 2016); *United States v. Lough*, No. 16-cr-18, 2016 WL 6834003 (N.D. W.Va. Nov. 18, 2016); *United States v. Johnson*, No. 15-cr-00340, 2016 WL 6136586 (W.D. Mo. Oct. 20, 2016); *United States v. Laurita*, No. 8:13CR107, 2016 WL 4179365 (D. Neb. Aug. 5, 2016); *Jean*, 207 F. Supp. 3d 920; *United States v. Eure*, No. 2:16-CR-43, 2016 WL 4059663, at *4 (E.D. Va. Jul. 28, 2016); *United States v. Matish*, 193 F. Supp. 3d 585 (E.D. Va. 2016); *United States v. Darby*, No. 2:16-CR-36, 2016 WL 3189703 (E.D. Va. June 3, 2016).

[19] *United States v. Dzwonczyk*, No. 4:15-CR-3134, 2016 WL 7428390 (D. Neb. Dec. 23, 2016); *United States v. Duncan*, No. 3:15-cr-00414-JO, 2016 WL 7131475 (D. Or. Dec. 6, 2016); *United States v. Owens*, No. 16-CR-38-JPS, 2016 WL 7053195 (E.D. Wis. Dec. 5, 2016); *United States v. Stepus*, No. CR 15-30028-MGM, 2016 WL 6518427 (D. Mass. Oct. 28, 2016); *United States v. Scarbrough*, No. 3:16-CR-035, 2016 WL 5900152 (E.D. Tenn. Oct. 11, 2016); *United States v. Allain*, No. 15-cr-10251, —F. Supp. 3d — 2016 WL 5660452 (D. Mass. Sept. 29, 2016); *United States v. Anzalone*, 208 F. Supp. 3d 358 (D. Mass. 2016); *United States v. Broy*, 209 F. Supp. 3d 1045 (C.D. Ill. 2016); *United States v. Knowles*, 207 F. Supp. 3d 585

the minority view, (3) the NIT Warrant was unlawfully issued and suppression was a proper remedy.[20]   Having reviewed the briefs, testimony and evidence, and with the benefit of the varying interpretations of Rule 41(b) as applied to the NIT Warrant at issue here, the undersigned recommends that the NIT is more akin to a "tracking device" as contemplated by Rule 41(b)(4).

The Federal Magistrates Act, 28 U.S.C. § 636(a), provides that "[e]ach United States magistrate judge serving under this chapter shall have within the district in which sessions are held by the court that appointed the magistrate judge . . . (1) all powers and duties conferred or imposed . . . by law or by the Rules of Criminal Procedure for the United Sates District Courts."  28 U.S.C. § 636(a).  Rule 41(b)(4) of the Federal Rule of Criminal Procedure confers upon the magistrate judge the "authority to issue a warrant to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both."  Fed. R. Crim. P. 41(b)(4).  The rule defines "property" to include "information" and "tracking device" as "an electronic or mechanical device which permits the tracking of the movement

(D.S.C. 2016); *United States v. Ammons*, 207 F. Supp. 3d 732 (W.D. Ky. 2016); *United States v. Torres*, No. 5:16-CR-285-DAE, 2016 WL 4821223 (W.D. Tex. Sept. 9, 2016); *Unitied States v. Henderson*, No. 15-cr-00565-WHO-1, 2016 WL 4549108 (N.D. Cal. Sept. 1, 2016); *United States v. Ryan Anthony Adams*, No. 6:16-cr-11-Orl-40GJK, 2016 WL 4212079 (M.D. Fla. Aug. 10, 2016); *United States v. Acevedo-Lemus*, No. SACR 15-00137-CJC, 2016 WL 4208436 (C.D. Cal. Aug. 8, 2016); *United States v. Werdene*, 188 F. Supp. 3d 431 (E.D. Pa. 2016); *United States v. Epich*, No. 15-CR-163-PP, 2016 WL 953269 (E.D. Wis. Mar. 14, 2016); *United States v. Michaud*, No. 3:15-CR-05351-RJB, 2016 WL 337263 (W.D. Wash. Jan. 28, 2016).

    [20] *See e.g., United States v. Levin*, 186 F.Supp.3d 26 (D. Mass. 2016); *United States v. Workman*, 205 F. Supp. 3d 1256 (D. Colo. 2016); *United States v. Croghan*, 209 F. Supp. 3d 1080 (S.D. Iowa 2016).

of a person or object."   Fed. R. Crim. P. 41(a)(2)(A), (E); 18 U.S.C. § 3117(b).

Defendant makes two arguments against a finding that the NIT was a tracking device: first, that the NIT was installed on Defendant's computer in Florida, which never was physically located within the Eastern District of Virginia and, second, that Defendant never "controlled" the government-controlled computer.   Doc. 24 at 9. While it is true that neither Defendant nor his computer physically traveled to Virginia, it is equally true that the FBI did not physically travel to Florida to install the NIT in Defendant's computer.   The FBI installed the NIT in the Eastern District of Virginia by augmenting the content on the Playpen website with additional computer instructions comprising the NIT.   Those computer instructions transmitted electronically over the Internet to track the movement of property — in this case, intangible "information," appearing as content on the Playpen website. Although Defendant focuses on the location of his computer, in order to become an activating computer, it is undisputed that Defendant had to log into the Playpen website, which was located in the Eastern District of Virginia, and voluntarily download content from that website.   Thus, Defendant's voluntary actions of "virtually" visiting the Eastern District of Virginia and downloading the NIT, which was embedded in the Playpen content, caused the NIT to travel to Defendant's computer located in Florida.   Accordingly, but for Defendant's voluntary actions, the NIT would have remained dormant in the Eastern District of Virginia and never deployed in the Defendant's computer in Florida.

One district court in the Western District of Virginia aptly illustrated this

point with the following analogy:

> [Defendant] took a virtual trip to the Eastern District of Virginia, but rather than travel by car, he traveled digitally—his vehicle was comprised of packets of information. Once there, the FBI attached a digital electronic tracking device to those packets, which [Defendant] virtually rode back to the [Middle District of Florida]. Upon his virtual return, [Defendant] parked his digital vehicle built of those packets of information on his computer, rather than in his driveway. At that point, the NIT sent back his digital address, just as a GPS tracker would send back his coordinates.

*Lough*, 2016 WL 6834003, at *5.   Importantly, after the NIT completed its function, which Agent Alfin testified generally was within "less than a second," it disappeared from Defendant's computer without a trace.   Doc. 48 at 37, 69, 76-77.   It did not make any changes to Defendant's computer.   *Id.* at 76-77.   Furthermore, it did not provide the FBI the ability to access Defendant's computer.   *Id.* at 38.

Other courts similarly have analogized a user's actions of accessing the Playpen website by logging in and downloading information, thereby activating the NIT, as a "virtual trip" over the Internet from the user's location to the Eastern District of Virginia.   *Matish*, 193 F. Supp. 3d at 612-13 (explaining that "whenever someone entered Playpen, he or she made, in computer language, 'a virtual trip' via the Internet to Virginia, just as a person logging into a foreign website containing child pornography makes 'a virtual trip' overseas" and "[w]hen that computer left Virginia—when the user logged out of Playpen—the NIT worked to determine its location, just as traditional tracking devices inform law enforcement of a target's location."); *Darby*, 190 F. Supp. 3d at 536 ("Users of Playpen digitally touched down in the Eastern District of Virginia when they logged into the site. When they logged

in, the government placed code on their home computers. Then their home computers, which may have been outside of the district, sent information to the government about their location."); *Sullivan*, 2017 WL 201332, at *6 ("Defendant voluntarily and deliberately came to the Eastern District of Virginia when he took affirmative steps to log into the Playpen website by entering a username and password. . . . Once in the district, the NIT was embedded in the material defendant was downloading and he carried it back to Ohio much like he would have carried a tracking device attached to his car. Once deployed, the NIT functioned in much the same way as a traditional tracking device sending location information back to the monitoring agents.").

Courts that have rejected the idea of a virtual tracking device have done so on the grounds that the NIT did not obtain the website user's IP address by tracking information but did so by searching the user's computer, or because the defendant "never controlled the government-controlled computer unlike a car with a tracking device leaving a particular district." *See e.g.*, *Adams*, 2016 WL 4212079, at *6 ("[T]he NIT does not track; it searches"); *Michaud*, 2016 WL 337263, at *6. Because the undersigned finds that the NIT did not search but tracked information as contemplated by 41(a)(2)(A), and because the NIT would not have been deployed in Defendant's computer but for Defendant's actions, the undersigned respectfully disagrees with the rationales provided by these opinions.

Having recommended that Judge Buchanan had the authority to issue the NIT Warrant, the Court will briefly discuss whether the warrant was valid. The Fourth

Amendment imposes three requirements for a valid warrant: (1) a search warrant must be issued by a neutral, disinterested magistrate judge; (2) it must be based on a showing of "probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense"; and (3) it must satisfy the particularity requirement. *Dalia v. United States*, 441 U.S. 238, 255 (1979) (citations omitted). Defendant does not contend that either of the first two requirements are unsatisfied. *See* Doc. 24. Defendant argues, however, that the Government failed to comply with the particularity requirement. *Id.* at 12-13. Specifically, Defendant argues, "[h]ad the government particularly described the place to be searched, i.e., a computer in Florida, no warrant could have issued. Instead, the search warrant erroneously described the place to be searched as the server, located in Virginia." *Id.* at 12.

The Fourth Amendment specifies that warrants must particularly describe the place to be searched. U.S. Const. amend. IV; *Dalia*, 441 U.S. at 255. A review of the affidavit and attachments submitted in the support of the NIT Warrant, however, reveals that Agent Macfarlane informed Judge Buchanan that the NIT would cause activating computers "*wherever located*" to send certain identifying information back to the FBI. Indeed, the need for the NIT Warrant arose precisely because individuals accessing the Playpen website were using the Tor network to conceal their true locations. The NIT Warrant described the "activating computers" subject to the search, the specific identifying information the NIT sought to obtain, the time period during which the NIT would be used, and how it would be used. The Court disagrees

with Defendant's contention that "the fact that countless other computers were also searched only bolsters [the] conclusion" that the NIT Warrant suffered from a lack of particularity. Accordingly, the undersigned recommends against a finding of a clear constitutional violation.

Assuming, *arguendo*, that Judge Buchanan did not have the authority to issue the NIT warrant, in the absence of a clear constitutional violation, Rule 41 requires suppression of evidence "only where (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *United States v. Loyd*, 721 F.2d 331, 333 (11th Cir. 1983) (per curiam) (quoting *United States v. Sefanson*, 648 F.2d 1231, 1235 (9th Cir. 1981)) (citations omitted). Defendant claims that he was prejudiced because the search of his computer would not have occurred had Rule 41(b) been followed. Defendant also argues that the officers acted in intentional and deliberate disregard of Rule 41 because "[i]t is evident from the plain language of Rule 41(b) that no interpretation would allow the search of potentially thousands of computers located outside the authorizing district." Doc. 24 at 13.

Defendant argues that he was prejudiced because the search authorized by the Residential Warrant would not have occurred but for information derived from the improperly issued NIT Warrant. Doc. 24 at 11-13. Several courts, however, have determined – and the undersigned agrees – that even had United States Magistrate Judge Buchanan concluded she lacked authority under Rule 41(b) to issue the

warrant, a United States District Judge could have issued the NIT Warrant without incident. *Bee*, 2017 WL 424905, at *5; *Lough*, 2016 WL 6834003, at *7; *Jean*, 207 F. Supp. 3d at 944.

Defendant next argues that the FBI should have known that the NIT warrant exceeded the jurisdictional scope of Rule 41(b) and cites a Texas district court case, *In re Warrant to Search a Target Computer at Premises Unknown*, 958 F. Supp. 2d 753, 757 (S.D. Tex. 2013), and a proposed amendment to Rule 41(b) that was then pending and has since been adopted, to support his argument. Doc. 24 at 13-14. The undersigned disagrees that *In re Warrant* or the proposed amendment to Rule 41(b) provided a clear indication that there was no authority for Judge Buchanan to issue the NIT Warrant.

First, *In re Warrant* is too factually distinguishable from the facts here to have placed the FBI on clear notice that there was no authorization for Judge Buchanan to issue the NIT Warrant. The information sought to be seized in *In re Warrant* was considerably more extensive and intrusive than the identifying information sought in the instant case. There, the government applied for a Rule 41(b) warrant that would authorize the government to surreptitiously install data extraction software on a target computer and seize records of Internet activity, including firewall logs, caches, browser history and cookies, search terms that the user entered into any Internet search engine, saved user names and passwords, documents, browsing history, user profiles, e-mail contents, e-mail contacts, and more. 958 F. Supp. 2d at 755-56. Here, the NIT was deployed for the specific purpose of retrieving identifying

information from the activating computers, in an effort to pinpoint the location of the Playpen content's final destination. Doc. 48 at 75-76. Additionally, the location of the target computer in *In re Warrant* where the installation was to occur was unknown to the government. 958 F. Supp. 2d at 757. In this case, the installation of the NIT occurred on a government-controlled computer within the district in which the NIT Warrant was issued. Furthermore, the government's application in *In Re Warrant* contained little to no information on how the target computer would be found and provided no assurance that the technique would not affect innocent computers. *Id.* at 758-59. Here, the NIT deployed on the Playpen website that operated as a hidden service on the Tor network, which required several affirmative steps to reach; and only those with an intent to view child pornography would take those steps, making it unlikely that any innocent user would stumble upon the website. Moreover, the *In Re Warrant* decision does not clearly and unambiguously provide, as Defendant suggests, that the NIT Warrant would not satisfy the requirements of Rule 41(b)(4). In conducting its Rule 41(b) analysis, the court stated

> [t]here is a plausible argument that the installation of software contemplated here falls within the statutory definition of a tracking device, because the software will activate the computer's camera over a period of time and capture latitude/longitude coordinates of the computer's physical location. But the Government's application would fail nevertheless, because *there is no showing that the installation of the "tracking device" (i.e. the software) would take place within this district.* To the contrary, the software would be installed on a computer whose location could be anywhere on the planet.

*Id.* at 758 (emphasis added). As noted, in the instant case, the warrant application clearly showed that the NIT would be installed in the Eastern District of Virginia.

Second, the proposed amendment to Rule 41(b) that was then pending does not provide a clear indication, as Defendant suggests, that the agents who sought the NIT warrant knew that Judge Buchanan lacked the authority to issue it. Rule 41(b)(6), effective as of December 1, 2016,[21] states, in pertinent part: "a magistrate judge with authority in any district where activities related to a crime may have occurred has authority to issue a warrant to use remote access to search electronic storage media and to seize or copy electronically stored information located within or outside that district if . . . the district where the media or information is located has been concealed through technological means . . . ." Fed. R. Crim. P. 41(b)(6). Defendant points to a May 5, 2014 memorandum from Honorable Reena Raggi, Chair of the Advisory Committee on Criminal Rules, addressed to the Committee on Rules of Practice and Procedure, which explained that the proposed amendment had its origins in a letter from Acting Assistant Attorney General Mythili Raman. *See* Hon. Reena Raggi, *Report Of Advisory Committee On Criminal Rules*, 477-488 (May 5, 2014).[22] The memorandum stated that "Rule 41's territorial venue provisions – which generally limit searches to locations within a district – create special difficulties for the Government when it is investigating crimes involving electronic information." *Id.* By way of example, the memorandum specifically addressed the scenario presented in this case and went on to state:

Although some judges have reportedly approved such searches, one

---

[21] The adopted text is identical to the proposed amendment to Rule 41(b). COMMITTEE ON RULES OF PRAC. AND PROC., 499 (May 29-30, 2014), http://www.uscourts.gov/sites/default/files/fr_import/ST2014-05.pdf

[22] Available at http://www.uscourts.gov/sites/default/files/fr_import/ST2014-05.pdf.

judge recently concluded that the territorial requirement in Rule 41(b) precluded a warrant for a remote search when the location of the computer was not known, and he suggested that the Committee should consider updating the territorial limitation to accommodate advancements in technology. *In re Warrant to Search a Target Computer at Premises Unknown*, 958 F. Supp. 2d 753 (S.D. Tex. 2013) (noting that "there may well be a good reason to update the territorial limits of that rule in light of advancing computer search technology").

*Id*. at 483-84.   The Court disagrees that the memorandum unequivocally establishes that the FBI agents knew the NIT Warrant would result in a clear violation of then-existing Rule 41(b).   Neither party introduced any evidence that Acting Assistant Attorney General Mythili Raman was involved in the FBI's investigation of the Playpen website, or that the agents who requested the NIT Warrant were involved in requesting the proposed amendment to Rule 41(b).   Instead, regarding the NIT Warrant application, Agent Alfin testified:

> This operation was conducted as a joint operation between the FBI and the Department of Justice Child Exploitation and Obscenity Section. Numerous lawyers from both entities were involved, lawyers from the FBI office of general counsel, lawyers from the Department of Justice. The affidavit was reviewed by these lawyers, it was submitted to a judge, we sought judicial oversight. At no time did anyone believe that this warrant was invalid or that we were doing something not permitted by the law.

Doc. 48 at 43-44.   Absent any evidence that those involved in the Playpen investigation and the NIT Warrant application also were involved in requesting the proposed amendment to Rule 41(b), the Court cannot conclude that the FBI agents knew the NIT Warrant would result in a clear violation of then-existing Rule 41(b). Lastly, there is no indication that the FBI failed to deploy the NIT in the manner described in the affidavit in support of the application.   To the contrary, the agents

took additional precautions than those the warrant authorized prior to deploying the NIT, such as waiting until someone actually attempted to download child pornography, rather than upon simply logging in.

Furthermore, even assuming *arguendo* that the NIT Warrant was issued in violation of the Fourth Amendment, under the good faith exception to the exclusionary rule as set forth in *Leon*, 468 U.S. 897, the undersigned recommends that the evidence obtained as a result of the search should not be excluded because of the officers' good faith reliance on the NIT Warrant. The good-faith exception to the exclusionary rule applies when a search warrant that was issued by "a detached and neutral magistrate" judge is declared invalid but an objectively reasonable law enforcement officer executing the warrant "reasonabl[y] rel[ied]" on it. *Leon*, 468 U.S. at 913, 920-21. The exception exists because "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* at 922. Moreover, "the exclusionary rule is not an individual right and applies only where it result[s] in appreciable deterrence." *Herring v. United States,* 555 U.S. 135, 141 (2009). The rule is "designed to deter police misconduct rather than punish the errors of judges and magistrate[ judge]s." *Leon,* 468 U.S. at 916. The operative inquiry in determining whether an officer acted in an objectively reasonable manner is: "whether a reasonably well trained officer would have known that the search [or seizure] was illegal despite the magistrate[ judge's] authorization." *Id.* at 922 n.23. The court must consider the totality of the circumstances in making

this determination. *United States v. Taxacher*, 902 F.2d 867, 871-72 (11th Cir. 1990). The *Leon* good faith exception applies in all but four limited sets of circumstances. 468 U.S. at 923. The four sets of circumstances are:

> (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role . . . ; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

*United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002) (internal citations and quotation marks omitted).

None of the exceptions to the *Leon* good faith exception exist here. The agents sought the ruling of a neutral and detached magistrate judge that probable cause existed to deploy of the NIT. There is no evidence that Agent Macfarlane knew that any of the information in the NIT Warrant affidavit was false or that he would have known it was false but for his reckless disregard for the truth. Furthermore, there is no evidence that Judge Buchanan wholly abandoned her judicial role. Agent Macfarlane's detailed and descriptive affidavit was not so lacking in probable cause as to render official belief in its existence entirely unreasonable. Moreover, as the Court explained above, the NIT warrant was not so facially deficient that it failed to particularize the things to be seized. The NIT warrant delineated the items to be seized from the activating computers and limited the NIT search to those items that would identify the location of the activating computer.

Additionally, as the Government points out, because Rule 41(b)(6) now specifically permits the use of the NIT, any need for deterrence is eliminated. On the other hand, "[t]he principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that 'offends basic concepts of the criminal justice system.'" *Herring*, 555 U.S. at 141 (citing *Leon*, 468 U.S. at 908)). Here, the marginal deterrence, if any, that would result from suppression does not outweigh the substantial societal cost of potentially allowing culpable defendants engaged in facilitation or distribution of child pornography to go free. The undersigned, therefore, recommends that even if the warrant is deemed deficient, the good faith exception to the exclusionary rule saves the evidence from suppression. After all, "[e]xclusion is a remedy of 'last resort,' justified *only* where the 'deterrence benefits of suppression' outweigh the 'substantial social costs' of 'ignor[ing] reliable, trustworthy evidence bearing on guilt or innocence.'" *United States v. Smith*, 741 F.3d 1211, 1219 (11th Cir. 2013) (citing *Davis v. United States*, 564 U.S. 229, 237 (2011)).

b. *Whether the Residential Warrant Was Supported by Probable Cause*

Defendant next argues that the facts alleged in the Residential Warrant affidavit were insufficient for a finding of probable cause to believe that any child pornography, or any evidence of accessing child pornography, would be found in Defendant's residence. Doc. 24 at 15-18. In his brief, however, Defendant acknowledges that Officer Ewert advised Judge McCoy of the nature of the Tor network, the installation of the NIT warrant, and the FBI's determination that the

user "thegabetrain" accessed the Playpen website on three occasions. *Id.* at 16.

First, Defendant challenges whether Officer Ewert's description of the "thegabetrain" user's activity on the Playpen website on those three occasions constitutes probable cause to issue the Residential Warrant to search Defendant's home. *Id.* at 16-18. Regarding the first of those three occasions, Defendant contends that although Officer Ewert's affidavit advised Judge McCoy that on February 22, 2015, someone with the user name "thegabetrain" with a particular IP address accessed the Playpen website, it did not state whether any illegal material was viewed or downloaded on that occasion. Doc. 24 at 16. Regarding the next two occasions when "thegabetrain" accessed the Playpen website, which occurred on February 25, 2015, Defendant contends that although Officer Ewert explained that the user name "thegabetrain" accessed two separate posts that contained links to images depicting child pornography, he failed to state whether the user ever actually accessed those links. *Id.* at 17. Moreover, Defendant argues that there was no allegation that "thegabetrain" that accessed the website on February 25, 2015 was the same "thegabetrain" that the FBI identified when it previously captured its IP address on February 22, 2015 since the FBI was unable to capture the user's IP address on February 25. *Id.*

Second, at the suppression hearing Defendant elicited through cross-examination of both witnesses the fact that certain forums on the Playpen website did not contain images of child pornography and child erotica. Doc. 48 at 53-58, 126-28. During closing arguments, Defendant thus argued that the Playpen website was

not entirely dedicated to child pornography and the lack of allegation in Officer Ewert's affidavit that Defendant accessed or possessed child pornography rendered the Residential Warrant defective. Doc. 48 at 168-70. As to Defendant's arguments, the Government responds that to accept them would result in the Court requiring conclusive proof, beyond a reasonable doubt, before a search warrant is issued. Doc. 38 at 38. The Government argues that in this case, when read in context, the affidavit clearly establishes probable cause. *Id.*

The undersigned recommends that the affidavit in support of the search warrant provided probable cause for the issuance of the Residential Warrant. "A sufficient basis for probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Lopez*, 649 F.3d 1222, 1245 (11th Cir. 2011) (quotation marks omitted). A judge must "make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "A fair probability, in turn exists when the facts and circumstances would lead a reasonably prudent person to believe that the place to be searched contains contraband or evidence of a crime." *Lopez*, 649 F.3d at 1245 (quotation marks omitted). "The connection between the objects to be seized and the premises to be searched can be established from the particular circumstances involved and need not rest on direct

observation." *Id.* (quotation marks omitted).

The Court agrees with the Government's contention that, when read in context, Officer Ewert's affidavit in support of the Residential Warrant established that there was a fair probability that child pornography, or evidence of accessing child pornography, would be found in Defendant's residence. As recited above, Officer Ewert's affidavit described the nature of the Tor network and the Playpen website specifically, "thegabetrain" user's activity on the Playpen website, and the IP connection between "thegabetrain" and Defendant's residence. Officer Ewert described the Playpen website as a child pornography website dedicated to the advertisement and distribution of child pornography. Gov't Ex. 2 ¶ 11. On the main page of the website, there were images of prepubescent girls wearing sexually provocative clothing and posing suggestively. *Id.* ¶ 14. Accessing the website required several affirmative steps, making it "extremely unlikely" to stumble upon it without understanding its content and primary purpose. *Id.* ¶ 8. Those steps required downloading the Tor software, obtaining Playpen's address from online postings describing both its content and location, and registering an account on the Playpen website by entering a username, password, and e-mail address; although a valid e-mail address was not required so as to protect user identity. *Id.* ¶¶ 8, 17. The user had to accept registration terms, which included recommendations to hide the users' identity and warnings of automatic bans against anyone discussing law enforcement related activity. *Id.* ¶¶ 14, 17.

To provide a nexus between Defendant's residence and the likelihood that

evidence of child pornography would be found there, Officer Ewert advised Judge McCoy that the agents were able to determine the physical address connected to "thegabetrain" user's IP address, which was the address of Defendant's residence. The Court is mindful that Officer Ewert's affidavit advised Judge McCoy that a username "thegabetrain" had logged into the Playpen website on three separate occasions between February 22-25, 2015, during one of which the FBI was able to determine its IP address but not the post accessed, and during two of which the FBI was able to determine the post accessed but not the IP address. Important to the Court's analysis, however, is the averment in the affidavit that "thegabetrain" user had been actively logged into the Playpen website *for a total of sixteen hours* between January 9, 2015 and March 4, 2015. *Id.* ¶ 32. Furthermore, the undersigned finds it unlikely that two or more individuals would log into the Playpen website using the same username and password, or that the individual user remained active for so long without clicking on any child pornography links.

The Court also finds unpersuasive Defendant's second argument – that the Playpen website was not entirely dedicated to child pornography – to support his contention that the Residential Warrant lacked probable cause. Defendant points to testimony elicited at the hearing and set forth in the Residential Warrant affidavit that, in addition to the topics clearly relating to child pornography, the Playpen website contained other topics or forums that did not appear on their face to contain child pornography, such as "General Discussion," "Security & Technology discussion," "How to," and "[Playpen] information and rules." Doc. 48 at 53-58, 126-28; *see also*

Gov't Ex. 2 ¶ 20. Officer Ewert's affidavit, however, explained that a review of these topic forums "revealed that the majority contained general information in regards to the [Playpen] site, instructions and rules for how to post, and welcome messages between users." Gov't Ex. 2 ¶ 24. All other remaining topics, however, "contained discussions about, and numerous images that appeared to depict, child pornography and child erotica depicting prepubescent girls, boys, and toddlers." *Id.* ¶ 25. Considering the totality of circumstances, due to the nature of the Playpen website, the required steps to register an account, and the amount of time spent on the website over a period of multiple days, there was probable cause to believe that "thegabetrain" accessed at least one image of child pornography on at least one occasion.

In summary, a probable cause finding "does not deal with hard certainties, but with probabilities," and based on all the circumstances set forth in Officer Ewert's affidavit, the "practical, commonsense decision" was that there was a fair probability that evidence of child pornography would be found in Defendant's residence. *See Gates*, 462 U.S. at 231, 238 (citation omitted) Accordingly, the undersigned recommends that the Residential Warrant was supported by probable cause.

Alternatively, even if the Residential Warrant was not supported by probable cause, the *Leon* good faith exception would apply to save the evidence from suppression. 468 U.S. 897. Here, Officer Ewert relied on information provided by the FBI that was obtained as a result of the NIT warrant, which was issued by a neutral and detached magistrate judge. There is no evidence that any information provided in Officer Ewert's affidavit was false or misleading. With the information

provided, Judge McCoy found probable cause to issue the warrant. Officer Ewert could not be expected to question Judge McCoy's probable cause determination, which was supported by factual assertions obtained as a result of a separately issued NIT Warrant, which the undersigned recommends was lawful. *Leon*, 468 U.S. at 921.

   c. *Whether Defendant was subject to a custodial interrogation without first being advised of his Miranda rights*

Finally, Defendant argues that he was "in custody" and therefore should have received *Miranda* warnings before being questioned by agents on the back lanai of his residence. Doc. 24 at 18-23. Defendant's argument rests in part on what he called a "gratuitous[]" statement that Defendant did not have to speak to the officers.[23] *Id.* at 22. The Government contends that no *Miranda* warnings were

---

[23] Specifically, the following exchange occurred at the beginning of the interview:
Officer Bunch: But you understand we're doin' a search warrant here, right?
Defendant: Yeah, you guys -- no one told me what – what's goin' on --
Officer Bunch: Yeah, but we're – we're doin' a search warrant. You're free to go and you don't have to talk to us, but we gotta limit where everyone kinda goes right now. We can't have you wanderin' around the house.
Officer Ewert: So for example --
Officer Bunch: That's why we're askin' with guns and everything, too --
Defendant: Right.
Officer Ewert: So, for example, we're on your lanai. You know, we're -- I mean you can go out either side. You know, it -- these doors are not locked to my knowledge, but you can unlock them from the inside where we are. So that's why we -- we kinda get that out there up front early, so that way you know that, uh, just like my partner said, you don't have to talk to us.
Officer Bunch: We're tryin' to figure out a couple things. If you wanna ask a question, ask us. But if any -- you know, at any time you could say, "Hey, Bunch, Zac, screw you. I'm not talkin' to you," and walk away. You know what I mean? It's, like, no hard feelings, but we're just tryin' to figure out a couple things.
Defendant: Okay.
Officer Bunch: Simple as that --
Officer Ewert: Right now we're just – it's just a fact finding mission right now.
Officer Bunch: Do you understand?
Officer Ewert: We're just havin' a discussion.
Officer Bunch: Do you understand me so far?

required because Defendant was free to leave and was not required to speak with the officers but chose to do so voluntarily.   Doc. 38 at 39-42.   The Court recommends that Defendant was not "in custody" for *Miranda* purposes, and therefore no *Miranda* warnings were required.   Because Defendant's incriminating and inculpatory statements were not taken in violation of *Miranda*, they are not subject to suppression here.

When determining whether an individual is "in custody," courts look at the totality of the circumstances and whether, under those circumstances, a reasonable "innocent" person in the defendant's position would not have felt free to leave. *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006).   "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether defendant was free to leave are irrelevant."   *Id.* (quoting *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)).   In deciding whether a reasonable person would have felt free to leave, courts may consider several factors, including the location and duration of the questioning, whether the defendant was restrained and whether he was released after the interview.   *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012).

"[T]he fact that an individual is told he is not under arrest and is free to leave is a fact of *substantial importance* in determining whether a reasonable person would have felt free to leave."   *Brown*, 441 F.3d at 1347 (emphasis added).   The Eleventh Circuit has found it "significant" that the interview took place in familiar and neutral surroundings and that the defendant acknowledged he understood officers'

---

Defendant: Yeah. Yeah.
Gov't Ex. 3t at 7-8.

statements that he was free to leave. *Id.* at 1348. Indeed, finding that a defendant not only was advised that he was not under arrest and was free to leave, but also *understood* that he was not under arrest and was free to leave, is "critical" to determining whether a defendant is in custody for *Miranda* purposes: "[u]nambiguously advising a defendant that he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the defendant is *not* in custody absent a finding of restraints that are 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'" *Id.* at 1346 (quoting *United States v. Muegge*, 225 F.3d 1267, 1271 (11th Cir. 2000)). The Court does not find such extensive restraints here.

Instead, each of the factors for consideration weigh in the Government's favor. First, Defendant was questioned by officers while on the back lanai of his home. The Court can think of few, if any, surroundings more familiar and neutral than one's home. The agents informed Defendant he was free to leave and need not speak with law enforcement at the beginning of the interview, and again later during the interview. *See* Gov't Ex. 3t at 7-8, 91. Similarly, when asked whether Defendant was talking to the agents of his own free will, Defendant confirmed that he was. *Id.* at 91. By the time Defendant agreed to be interviewed by agents, he was fully aware of the agents' true purpose at his residence and volunteered to speak with law enforcement even after being told that he was not required to do so. Although Defendant was told he was free to leave, he never expressed a desire or attempted to do so. Moreover, the officers' weapons were concealed during the interview, and

Defendant was released after questioning.   Doc. 48 at 110.

Officer Ewert testified that the interview took place on Defendant's lanai and described the interview as "very laid back, lighthearted" that contained laughing and discussions about video games.   Doc. 48 at 110.   The undersigned listened to the audio recording of the interview, as well as reviewed the transcript of the interview, and concludes that the interview was not inherently coercive.   Defendant agreed that the agents' treatment of him was "good."[24]   *See* Gov't Ex. 3t at 92.

"*Miranda* does not erect an absolute *per se* bar on any conversation with the accused by the investigating officer.   It must be applied instead with flexibility and realism."   *United States v. Castro*, 723 F.2d 1527, 1532 (11th Cir. 1984).   The "ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."   *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)); *see also United States v. Phillips*, 812 F.2d 1355, 1359 (11th Cir. 1987) (noting the Supreme Court's position that the "ultimate inquiry" is whether there is a restraint on movement similar to that of formal arrest).   Based on the facts of this case, the undersigned recommends there was not.   Because the Court recommends that

---

[24] Specifically, this portion of the interview went as follows:
Officer Bunch: But really, since we've been here today, I mean how have we -- how have we been with you --
Defendant: It – it's – it's been good.
Officer Bunch: Okay. And it's -- that ain't never gonna change --
Officer Ewert: We haven't threatened you in any way or made any promises or --
Defendant: No. No, you're -- no, you guys are good.
Gov't Ex. 3t at 92.

Defendant was not "in custody," no *Miranda* warnings were required before agents began their interview with Defendant. Accordingly, the Court will not recommend suppression on this ground.

Accordingly, for the reasons described above, it is hereby **RESPECTFULLY RECOMMENDED** that Defendant's Motion to Suppress Evidence (Doc. 24) be denied.

**DONE** and **ENTERED** in Fort Myers, Florida on this 27th day of April, 2017.


CAROL MIRANDO
United States Magistrate Judge


Copies:

Honorable John E. Steele
Counsel of Record